IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

**ANNE ELIZABETH STANLEY**

    Plaintiff,

v.                                                                                                 No. 07-CV-1013 BB/LFG

**ABACUS TECHNOLOGY
CORPORATION**

    Defendant.

## **MEMORANDUM OPINION**

THIS MATTER comes before the Court on a motion for summary judgment submitted by Defendant, the Abacus Technology Corporation ("Abacus" or "the defendant"). (Docs. # 29 & 30). The Plaintiff, Anne Elizabeth Stanley ("Ms. Stanley" or "the plaintiff"), was an employee of Abacus from December 2004 through April 2006. She sues for discrimination and retaliation under the Pregnancy Discrimination Act ("the PDA"), an amendment to Title VII of the Civil Rights Act of 1964 ("Title VII").[1] For the reasons set forth below, these claims fail as a matter of law, and Abacus's motion for summary judgment is GRANTED.

## **FACTUAL BACKGROUND**

This lawsuit arises out of the April 2006 termination of Ms. Stanley's employment as a photographer for Abacus. Kirtland Air Force Base ("Kirtland") in Albuquerque hired Abacus to

---

[1] In her complaint, the plaintiff also claimed intentional infliction of emotional distress under New Mexico common law. (*See* Complaint, Doc. #1 at 11). She abandoned this claim in her Response to Abacus's Motion. (Pl.'s Resp., Doc. #33 at 21). The Court thus need not address that claim here.

provide the Air Force with photographers.  Ms. Stanley's duties included general photography support for the Air Force Base, as well as for the Kirtland newspaper.  Her job required her to be available on short-notice to respond to requests for photographers within approximately thirty minutes.  This was known as "alert duty."

**Ms. Stanley's Relationship With E Annette Oliver**

Throughout her employment, Ms. Stanley had a difficult relationship with Abacus's receptionist, E Annette Oliver.  According to the plaintiff, she complained to her immediate supervisors, William Aguilar and Ken Moore, about Ms. Oliver eight to ten times.  (Stanley Dep. 62:13-18, May 12, 2008).  In August 2005, their supervisors, Mr. William Aguilar and Mr. Ken Moore, required Ms. Stanley and Ms. Oliver to discuss their animosity in a meeting.  (Stanley Dep. 63:1-6).  After that meeting, both Ms. Oliver and the plaintiff were warned that one or both could be terminated if they did not treat each other with respect.  *Id.*

**Ms. Stanley's Pregnancy**

In March 2005, Ms. Stanley discovered she was pregnant.  Within the first trimester of her pregnancy, Ms. Stanley believes she informed Mr. Aguilar that she was expecting a child.  (Stanley Dep. 40:10-19).  At that point, however, Ms. Stanley did not request any alteration of her work conditions.  *Id.* at 41:14-16.  In fact, two to three months elapsed before Ms. Stanley requested that Mr. Aguilar remove her from alert duty rotation because of her pregnancy.  *Id.* at 41:22-14.  In response, Mr. Aguilar requested a doctor's note to confirm the extent of Ms. Stanley's physical limitations, and, once Ms. Stanley provided such note, he agreed to remove her from alert duty.  (Aguilar Dep. 31:7-32:8).

Ms. Stanley worked in a more limited capacity until she gave birth to a daughter on November 11, 2005. She then took maternity leave for over one month. When she returned from maternity leave, Ms. Stanley encountered conflicts between childcare and her work schedule. In particular, Ms. Stanley wanted to breast-feed her newborn during her lunch hour. According to Ms. Stanley, however, in a six week period after returning from maternity leave, she was scheduled to work during her lunch hour "at least" four times. (Stanley Dep. 129:12-24). She admits, though, that she "probably" did not tell her supervisors of the conflict until after the third time. *Id.* at 129:15-18. Moreover, Ms. Stanley never requested a long-term schedule accommodation to ensure that her lunch hours were always free. *Id.* at 133:2-13. She instead asked Mr. Aguilar to reschedule or reassign specific job assignments as they arose.

In addition to issues related to her lunch hour, Ms. Stanley had another problem related to her daycare arrangements. Specifically, she made plans most workdays to pick up her daughter from a daycare center at 4:00pm. Though her daily schedule typically required her to be at work from 7:15am to 4:00pm, she sometimes received assignments that could not be completed by 4:00pm, interfering with her obligation to retrieve her child from daycare.

Again, however, Ms. Stanley never sought a comprehensive plan to avoid receiving such assignments. (Stanley Dep. 132:22-133:13). Instead, as with her lunch hour breast-feeding, she requested a rescheduling or reassignment of particular tasks as they arose so she could retrieve her child from daycare on time. *Id.* at 139:7-140:7. Ms. Stanley does not recall Mr. Aguilar, or any other supervisor at Abacus, ever refusing a request to accommodate her schedule for childcare purposes. *Id.* at 243:8-25.

3

**Ms. Stanley's Performance Evaluation**

In January 2006, Mr. Aguilar provided the plaintiff with a Staff Performance Appraisal, akin to an annual evaluation. On that appraisal, an employee could receive five possible ratings: (1) unacceptable; (2) marginal; (3) good; (4) excellent; and, (5) outstanding. Ms. Stanley got an overall rating of "good." Yet she received a "marginal" rating in staff relations, largely because of her relationship with Ms. Oliver. On the other hand, Ms. Stanley received an "excellent" for client relations. Ms. Stanley claims that Mr. Aguilar explained this "excellent" evaluation by saying that he could not give her an "outstanding" rating "because [she] was pregnant during most of 2005" and "he couldn't gauge [her] work standard." (Pl.'s Resp. at 15).

This evaluation upset Ms. Stanley and soon after receiving it, she sent a memorandum to the manager of Abacus's human resources department, Ngoc Nguonly. The memorandum detailed Ms. Stanley's three "areas of concern"—sexism, management style, and evaluations. In the memorandum, Ms. Stanley complained mainly about the way in which Mr. Aguilar had treated her during a particular, antagonistic encounter between the two.[2]

Ms. Nguonly remained unconvinced and she requested greater detail on Ms. Stanley's allegations of "sexism." Ms. Stanley provided none. Thus, Ms. Nguonly responded by saying that Ms. Stanley's description of events did not amount to "sexism," and that if she wanted an investigation to continue, she had to provide further evidence.

---

[2]In January 2006, an Abacus photographer called Mr. Aguilar to say he would be unable to perform a particular job due to an appointment. Mr. Aguilar then asked Ms. Stanley whether she would perform the job. Ms. Stanley declined, explaining that she was feeling sick and "didn't want to touch the customers." According to Ms. Stanley, this irritated Mr. Aguilar and he ordered her to go back to her office in front of customers. Ms. Stanley testified that Mr. Aguilar had "yelled at her like [she] was a dog." (Stanley Dep. 167:16-168:9).

As a result, Ms. Stanley sent another memorandum, this one detailing Mr. Aguilar's scheduling her for job assignments beginning at 3:00pm, even though she had to retrieve her child from daycare at 4:00pm.  (*See* Memo. for Record, Def.'s Exh. R at 2).  Even in that memorandum, however, Ms. Stanley noted that Mr. Aguilar accommodated her needs when she explained that her maternal duties precluded her from beginning a job at 3:00pm.  *Id.*  Ms. Stanley's primary grievance, therefore, appears to be that she had to continue asking for reassignment and rescheduling—implying that Mr. Aguilar should have presumed that she could no longer take assignments beginning at 3pm because of her newborn.  *Id.*

Mr. Aguilar responded to Ms. Stanley's complaint memoranda with a letter apologizing that she interpreted his words as impolite when he ordered her back to her office in front of customers.  (Apology Letter, Pl.'s Exh. 14).   Rather than ameliorating the situation, however, this letter soon became fodder for a new conflict.  Indeed, Ms. Stanley showed Mr. Aguilar's apology letter to her co-workers, sparking gossip in the office.  Mr. Aguilar, Mr. Moore, and Ms. Nguonly responded by sending a memorandum to Ms. Stanley warning her that such interactions between employees and management are "confidential information" and "not privy to public discussion."  (Memo. to file, Pl.'s Exh. 15).  This memorandum was a "formal written warning," stating that further violations of Abacus's policies would lead to other disciplinary action, including termination.  *Id.*

**Ms. Stanley's Termination**

By April 2006, the relationship between Mr. Aguilar and Ms. Stanley reached the breaking point.  On the afternoon of April 5, 2006, Ms. Stanley left work early—at 3:30pm—without requesting permission from her supervisors.  The following morning, Mr.

Aguilar sent the plaintiff an e-mail noting that he was unable to locate her after 3:30pm the previous day.  Ms. Stanley replied to Mr. Aguilar by e-mail, with a carbon copy to Mr. Moore and Ms. Nguonly among others, by admitting to leaving early.  Yet her e-mail was unapologetic, declaring that she chose to "act by example," and accusing Mr. Aguilar of being "inconsiderate" and "playing power games."  (*See* e-mail, Apr. 6, 2006, Pl.'s Exh. 17).  The plaintiff admits that her reply e-mail was disrespectful.  (Stanley Dep. 207:8-10).

That afternoon, Mr. Aguilar and Mr. Moore, in collaboration with the human resources department, drafted a termination letter.  (*See* Termination Letter, Apr. 6, 2006, Def.'s Exh. W).  The letter detailed five reasons for the termination.  *Id.*  These included her "marginal" evaluation on staff relations, her breach of confidentiality, other violations of Abacus's policies, her deliberate refusal of an assignment, and her leaving work early without permission.  *Id.*  Ms. Stanley did not deny any of the five reasons, but she wrote a final memorandum to the human resources department in which she defended her record as an Abacus employee.  (*See* Memo. for Record, Def.'s Exh. X).  However, in that final memorandum she made no apology for her alleged insubordination or for the disrespectful e-mail she sent Mr. Aguilar with carbon copies to his colleagues.  *Id.*

As support for her claims of pregnancy discrimination and retaliation, the plaintiff has provided affidavits from two former employees of Abacus, Monique Sanders and Shalla Halverson.  The first—from Ms. Sanders—asserts that, in her opinion, "discrimination at Abacus is part of the culture."  (*See* Pl.'s Exh. 1).  Ms. Sanders further says she was subjected to sexual harassment during her tenure at Abacus, and that it was "common knowledge" that Ms. Stanley was fired after she complained of sexism.  *Id.* at 2.

In Ms. Halverson's affidavit, she states her belief that Ms. Stanley was fired because she was pregnant and filed complaints. *See* Pl.'s Exh. 2 at 1. Ms. Halverson also alleges a pattern of sexism at Abacus, as "male employees would . . . be gone for several days at a time . . . and nothing would happen to them." *Id.* Ms. Halverson also stated that Ms. Stanley told her that she had been sent on assignments that were inappropriate for a pregnant employee. *Id.*

## Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) governs motions for summary judgment. Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). Also, the trial court must review the evidence presented in the light most favorable to the non-moving party—the plaintiff in this case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## Discussion

The following discussion analyzes Ms. Stanley's PDA claims, first in terms of alleged discrimination based on her pregnancy, and second, with regard to the alleged discrimination arising after her daughter was born—based on her need to breast-feed and care for her daughter. Finally, the Court analyzes the plaintiff's retaliation claim.

**I. Ms. Stanley's Pregnancy Discrimination Act Claim**

A.  Ms. Stanley Cannot Make a *Prima Facie* Case of Sex Discrimination Under the PDA.

Congress created the PDA in 1978 as an expansion of Title VII, which prohibits sex discrimination in the workplace. 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth,

7

or related medical conditions"); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 684 (1983) (declaring that, "discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.").

As this is a Title VII claim, the well-established burden-shifting framework of *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973), governs this analysis. The first issue under that three-part framework is whether the plaintiff established a *prima facie* case of employment discrimination based on sex. *Id.* at 802-805. Specifically, to do this, the plaintiff must show (1) that she was a member of a protected class; (2) that she was performing her duties satisfactorily; (3) that she was subjected to an adverse employment decision; and (4) that the adverse employment decision occurred in circumstances that give rise to an inference of discrimination based on her membership in a protected class. *Id.* at 802 *; McNill v. New York City Dep't of Corr.*, 950 F. Supp. 564, 568-69 (S.D.N.Y., 1996).

If Ms. Stanley makes the requisite *prima facie* showing of discrimination as outlined above, Abacus then must provide evidence to show its actions were legitimate and non-discriminatory. *McDonnell*, 411 U.S. at 802-03; *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). If Abacus provides a non-discriminatory explanation for its adverse employment action against Ms. Stanley, she then has an opportunity to show why such explanation is a mere pretext or "unworthy of belief." *Adamson*, 514 F.3d at 1145-46.

### 1. Whether Ms. Stanley was a Member of a Protected Class When She Suffered Discrimination

The Court must determine whether Ms. Stanley satisfies the first element of the *prima facie* case of Title VII discrimination—that she was a member of a protected class. Virtually no

evidence indicates that Ms. Stanley was treated unfairly while she was pregnant.  Instead, the thrust of the plaintiff's argument is that she suffered discrimination after her daughter was born, when she needed to breast-feed and adhere to daycare arrangements.

Ms. Stanley still argues, however, that her less-than-perfect evaluation was in part due to her pregnancy.  As such, she relies on her own testimony recalling Mr. Aguilar's explanation for the "excellent" rating—that he would have ranked her "outstanding" were it not for her pregnancy.  (Stanley Dep. 86:21-87:11).  Mr. Aguilar denies that he marked her down because she was pregnant.  (Aguilar Dep. 54:4-7).  But the Court must accept Ms. Stanley's testimony as true at this stage.  Thus, assuming Mr. Aguilar treated Ms. Stanley less favorably than he would have were it not for her pregnancy, she has satisfied the first element of the *prima facie* case.

### 2.  Whether Ms. Stanley was Performing her Duties Satisfactorily

The Court next must determine whether Ms. Stanley was performing her duties satisfactorily.  Ms. Stanley's evaluations were generally positive, and she has provided evidence of her competence in photography.  (*See, e.g.,* Pl.'s Exh H at 7, 10) (e-mails stating, among other things, "I have received nothing but superb and quality service from you as a base photographer"); (*see also* Decision of N.M. Dept. of Labor Appeals Trib., Pl.'s Exh. 12 at 2). Moreover, when it terminated her, Abacus did not complain about the quality of Ms. Stanley's photography work, but rather her personal interactions with co-workers and supervisors, her insubordination, and her violation of policies.  Because the defendant has provided no evidence that the quality of Ms. Stanley's work was deficient, and she has given evidence supporting her claim that she was fulfilling her job duties satisfactorily, Ms. Stanley has satisfied the second part of a *prima facie* claim of discrimination under the PDA.  *Cf. Mattera v. Gambro, Inc.*, 94 Fed.

Appx. 725, 729 (10th Cir. 2004) (finding that an employee's insistence that she was performing her job duties satisfactorily, combined with positive evaluations, and a positive letter of recommendation from her employer were sufficient to satisfy this element).

### 3.  Whether Ms. Stanley Suffered an Adverse Employment Action

A more difficult issue is whether Ms. Stanley suffered an adverse employment action during her pregnancy.  Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex."  42 U.SC. § 2000e-2(a)(1).  Also, as noted, the PDA included an individual's pregnancy as part of her sex for purposes of Title VII.

Ms. Stanley cites Mr. Aguilar's explanation for her "excellent" job evaluation as evidence of an adverse employment action due to her pregnancy.  She further argues that she was fired, in part, because of the "excellent" evaluation she received.  (Pl.'s Resp. at 15).  Yet a review of the termination letter reveals that Abacus cited her "marginal" rating on staff relations as grounds for her termination, not her "excellent" rating.  (Termination Letter, Def.'s Exh. W).  As noted, the "marginal" rating was not based on the plaintiff's pregnancy, but rather on her problematic relationship with Ms. Oliver.  *Id.*

The question thus becomes whether the "excellent" rating, standing alone, constitutes an adverse employment action.  The Tenth Circuit liberally construes the term "adverse employment action" to include negative job evaluations when they have a causal relationship with ultimate termination.  *Cf. Toth v. Gates Rubber Co.*, No. 99-1017, 2000 WL 796068 (10th Cir. June 21,

10

2000) (unpublished) (finding that a negative evaluation, which led to an employee's discharge, was evidence of an adverse employment action on summary judgment).

In this case, however, the evidence provided does not persuade the Court that Ms. Stanley's "excellent" rating caused her discharge. On the contrary, the plaintiff's evidence suggests that her termination came because of her behavioral problems and lack of interpersonal skills. (*See* Termination Letter, Pl.'s Exh. W). The first mention of Ms. Stanley's termination came after her meeting with Ms. Oliver—when she and Ms. Oliver were both threatened with termination.

It next arose after she shared Mr. Aguilar's apology letter with her colleagues, violating Abacus's alleged confidentiality policy.[3] Then, her admittedly disrespectful e-mail to Mr. Aguilar was the final straw. Given the foregoing, the "excellent" rating appears not to have factored into her ultimate discharge.

Since the Court cannot find a causal relationship between Ms. Stanley's "excellent" rating and her ultimate discharge, it finds that she did not suffer an adverse employment action when she was pregnant. Hence, Ms. Stanley has not satisfied the four elements to make a *prima facie* case under Title VII with regard to alleged discrimination based on her pregnancy.

---

[3]Ms. Stanley denies that she knew of the confidentiality policy, and the defendant has not produced evidence of its existence other than the apology letter itself. (Pl.'s Resp. at 10). The Court thus accepts, for purposes of this opinion, Ms. Stanley's assertion that she was unaware of the policy. Abacus, however, did use the letter as a basis for admonishing her and nothing indicates that the formal warning in the apology letter was related to her pregnancy.

B.  Ms. Stanley Suffered No Discrimination Due to Breast-Feeding, But Even if She Had, That Would Not Provide a Claim Under the PDA.

Ms. Stanley's alternate PDA-related argument is that her employers should have known not to give her assignments during her lunch hour or beginning at 3pm, so as not to interfere with her ability to breast-feed or retrieve her daughter.  This claim fails as a matter of law.

The evidence Ms. Stanley has provided does not suggest that Abacus supervisors discriminated against Ms. Stanley due to her need to breast-feed or pick up her daughter from daycare.  On the contrary, Ms. Stanley cannot recall an instance in which she requested an accommodation because of a childcare-related conflict and her employers did not consent.

It appears then that Ms. Stanley's primary grievance is that Mr. Aguilar did not pro-actively make comprehensive changes to her schedule under the presumption that maternal duties would leave her unavailable during her lunch hour and immediately at 4pm.  Yet, as the defendants point out, such a presumption could itself be a violation of Title VII.  (*See* Def.'s Mot. S.J., Doc. #30 at 1, 20); *Maldonado v. U.S. Bank*, 186 F.3d 759, 766 (7th Cir. 1999) (finding that an employer's anticipating a pregnant employee may be unable to fulfill duties is "the exact sort of employment action that the PDA was designed to prevent.").  Since Ms. Stanley never requested an accommodation, Mr. Aguilar's failure to effect a permanent change in her schedule is not actionable under Title VII.[4]

---

[4] As the defendants correctly point out, the PDA prevents discrimination, but does not require employers to make special accommodations for employees who are pregnant or are attending to pregnancy-related medical conditions.  Indeed, under the PDA, "employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994).  Nevertheless, whenever Ms. Stanley requested a specific accommodation for her pregnancy and childcare-related needs, Abacus granted it.

Also, other courts facing similar facts have uniformly held that breast-feeding does not fall within the scope of the "related medical conditions" language in the PDA. *See, e.g., Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 439 (6th Cir. 2004) ("courts have uniformly held that rules relating to regulation of breast-feeding do not violate the PDA"); *Fejes v. Gilpin Ventures*, 960 F. Supp. 1487, 1492 (D.Colo. 1997) (stating that the PDA does not require employers to accommodate the childcare concerns of breast-feeding employees); *McNill*, 950 F. Supp. at 570 ("conditions of the child that require the mother's presence are not within the scope of the PDA"); *Wallace v. Pyro Mining Co.*, 789 F. Supp. 867, 868 (W.D. Ky. 1990) (finding that the plain language and legislative history of the PDA cannot be interpreted to require employers to allow their employees to breast-feed children during work hours). Thus, since Ms. Stanley's evidence does not support a finding that her employers treated her differently based on her need to breast-feed or retrieve her daughter, and because breast-feeding does not fall within the scope of the PDA, the defendant's motion for summary judgment is GRANTED.

## II. Ms. Stanley's Retaliation Claim

Ms. Stanley alleges that Abacus retaliated against her by terminating her after she complained to the human resources department by sending memoranda charging, among other things, "sexism." To make a *prima facie* claim of retaliation under Title VII, Ms. Stanley must show: (1) that she engaged in an activity that Title VII protects; (2) that Abacus took an adverse employment action against her after her protected activity; and (3) that there was a causal connection between her participation in the protected activity and the adverse employment action. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998).

The plaintiff argues that her complaints to the human resources department were protected activities under Title VII. She further argues that her discharge constituted an adverse employment action, and that, since it occurred just six days after she complained, a causal relationship may be inferred based on temporal proximity. (*See* Pl.'s Resp. at 20).

Again, under *McDonnell-Douglas*, if Ms. Stanley can establish these elements, the burden shifts to Abacus to show that its adverse employment action was legitimate and non-discriminatory. 411 U.S. 792, 803 (1973). If Abacus produces evidence that its action was legitimate and non-discriminatory, Ms. Stanley must show that Abacus's purported reasons for terminating her were mere pretext. *Id* at 804.

Ms. Stanley's complaints of sexism to Abacus's human resources department are protected activities under Title VII. *See, e.g., Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir.1999); *McCue v. State of Kansas, Dep't of Human Resources*, 165 F.3d 784, 789 (10th Cir.1999) (holding that complaining of discrimination is protected behavior). Also, Ms. Stanley's discharge constitutes an adverse employment action occurring subsequent to the protected activity. *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (confirming that termination constitutes an adverse employment action for purposes of Title VII retaliation claims). On the third element of the *prima facie* case, temporal proximity between the protected behavior and the adverse employment action is sufficient to establish a causal relationship. *See Fye v. Oklahoma Corp. Com'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) ("To establish a *prima facie* case of retaliation, "a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action."); *see also Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir.2006) (stating that a plaintiff may establish a causal connection by

presenting evidence that "protected conduct [was] closely followed by adverse action."). Ms. Stanley has thus established the three *prima facie* elements of a retaliation case.[5]

The Court must now look to Abacus's explanation for Ms. Stanley's discharge to determine whether it is legitimate and non-discriminatory. *McDonnell*, 411 U.S. at 803. The most obvious evidence of Abacus's motives is contained in the termination letter itself. That letter states that Ms. Stanley was fired because of her "marginal" rating on staff relations, her breach of confidentiality, her other violations of Abacus policies, her deliberate refusal to take a particular assignment without justification, and her leaving early from work on at least one occasion without permission or justification. (*See* Termination Letter, Def.'s Exh. W). None of these cited rationales implicates her complaints of sexism. Each is a legitimate, non-discriminatory motive for terminating Ms. Stanley, and she did not deny any of them in her final memorandum to the human resources department. (*See* Memo. for Record, Def.'s Exh. X). The evidence suggests instead that Ms. Stanley's disrespectful e-mail to Mr. Aguilar was the final straw in a series of turbulent personal relationships, unrelated to her complaints. Abacus has thus provided convincing evidence of non-retaliatory rationales for Ms. Stanley's discharge.

The Court then must see whether Ms. Stanley has provided evidence raising an inference of pretext. In doing so, the Court analyzes the affidavits of Ms. Sanders and Ms. Halverson. In her affidavit, Ms. Sanders opines that discrimination is "part of the culture" at Abacus. (Pl.'s

---

[5]The Court acknowledges that the last two complaint memoranda Ms. Stanley sent did not raise the issue of sexism. (*See* Def.'s Mot. S.J. at 21). This undermines the plaintiff's argument that temporal proximity between the protected activity and the adverse action was sufficient to establish a causal connection between the two. However, whether the amount of time that elapsed between Ms. Stanley's complaints of sexism and her discharge was too great to establish a *prima facie* case of retaliation is immaterial because, as explained below, Abacus established legitimate, non-retaliatory reasons for Ms. Stanley's termination.

Exh. 1 at 1). She further states that her supervisors subjected her to sexual harassment and what may have been sex discrimination when she worked at Abacus. *Id.* at 1-2. Yet Ms. Sanders does not suggest that Ms. Stanley was aware of other alleged instances of harassment at Abacus. This is relevant because several courts have held that "evidence of a general work atmosphere, including evidence of harassment of other[s] . . . may be considered in evaluating a claim as long as [the plaintiff] presents evidence that [she] knew about the offending behavior. *Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1163 (10th Cir. 2008) (quoting *Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995)); *see also Burnett v. Tyco Corp.*, 203 F.3d 980, 981 (6th Cir. 2000). Also, Ms. Sanders left Abacus in September 2002—over two years before Ms. Stanley began working there. She thus has no personal knowledge of the circumstances surrounding Ms. Stanley's termination. Perhaps most important, Ms. Sanders' testimony that "it is common knowledge that [the plaintiff] was fired after she complained about being discriminated against" does not raise a genuine dispute of a material fact. *Id.* at 2. Indeed, Abacus stipulates that Ms. Stanley was discharged after she complained, yet it denies that she was discharged because she complained.

As for Ms. Halverson, she makes a bald assertion in her affidavit that Ms. Stanley was terminated "because she made a formal complaint." (Pl.'s Exh. 2 at 1). However, this statement is pure speculation. Ms. Halverson indeed acknowledges that she did not get involved in the decision-making process on terminations. (*See* Pl.'s Exh. 2 at 1); *See, e.g., Jarvis v. Potter*, 500 F.3d 1113, 1120 (10th Cir. 2007) (finding that survival of summary judgment requires a plaintiff to produce something beyond unsupported, conclusory allegations) *and Lombardo v. Potter*, 368 F. Supp.2d 1178, 1182 (D.Kan. 2005) (finding a plaintiff's affidavit insufficient to survive

16

summary judgment because its substance was little more than unsupported, conclusory assertions made without personal knowledge).  Ms. Halverson also repeats Ms. Stanley's comment on being sent on assignments that were inappropriate for a pregnant woman.  (*See* Pl.'s Exh. 2 at 1).  As a statement, other than the one made under oath, offered into evidence for the truth of the matter asserted, this is mere hearsay.  FED. R. EVID. 801(c); *see also Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.").  Finally, Ms. Halverson's assertion that "male employees would . . . be gone for . . . days . . . and nothing would happen to them" is insufficient because it is clearly not based on personal knowledge nor specific enough to raise an inference of pretext insofar as discrimination against Ms. Stanley is concerned.  *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (co-worker lacked personal knowledge sufficient to support global statements in an affidavit); *see also Merritt v. Hawk*, 153 F. Supp.2d 1216, 1224 (D. Colo. 2001) (finding that conclusory or vague allegations in an affidavit cannot create genuine issues of material fact to preclude summary judgment on a retaliation claim).  A review of the affidavits therefore does not reveal enough admissible evidence to support the plaintiff's claims, and the Court is unpersuaded that they raise an inference of pretext.  Accordingly, the defendant's summary judgment motion is GRANTED.

## **CONCLUSION**

In sum, Ms. Stanley's claim under the PDA fails for two reasons.  First, she has not provided sufficient evidence that her supervisors at Abacus discriminated against her on the basis of her pregnancy.  Whenever she requested an alteration in job duties necessitated by her

pregnancy, breast-feeding, or childcare obligations, her employers consented. Moreover, breast-feeding is not a "related medical condition" within the scope of the PDA. Thus, summary judgment on this claim is GRANTED.

Finally, Ms. Stanley's retaliation claim fails because she has not demonstrated that her memoranda to Abacus's human resources department caused her termination. Instead, Abacus has provided ample evidence that Ms. Stanley was discharged for reasons unrelated to her complaints of sexism, her pregnancy, or her childcare obligations. Summary judgment on the retaliation claim, too, is thus GRANTED.

_____
BRUCE D. BLACK
United States District Judge